UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
SERGEY BORODITSKIY, ANATOLIY :
KOVAL, and ALEKSANDER NESTER, :
:
Petitioners, :
: 17-CV-689 (VSB)
v. :
: **OPINION & ORDER**
EUROPEAN SPECIALTIES LLC and :
BIEBER LLC, :
:
Respondents. :
:
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/4/2018

Appearances:

Yitzchak E. Soloveichik
Peretz Bronstein
Bronstein, Gewirtz & Grossman
New York, New York
*Counsel for Petitioners*

Robert J. Stone, Jr.
Robert J. Stone, Jr. Attorney at Law
New York, New York
*Counsel for Respondents*

VERNON S. BRODERICK, United States District Judge:

Before me is the Petition to Stay Arbitration ("Petition" or "Pet.") of Petitioners Sergey

Boroditskiy, Anatoliy Koval, and Aleksander Nester (collectively, "Petitioners"). (Doc. 1, Ex.

2.) Respondents European Specialties, LLC and Bieber, LLC (collectively, "Respondents") seek

to compel Petitioners to arbitrate, in their individual capacities, certain claims relating to a

distribution agreement. Because I find that Petitioners each signed the distribution agreement in

their capacity as members of Bieber European Architectural Windows & Storefronts NY, their

limited liability corporation, and Respondents have failed to demonstrate that Petitioners

(i) acted as the alter ego of their limited liability corporation or (ii) should be estopped from avoiding arbitration, the Petition is GRANTED.

## I.   Factual Background

On December 8, 2016, Respondents initiated an arbitration against Petitioners and Red Hook Windows, LLC, formerly known as Bieber European Architectural Windows & Storefronts NY ("BEAW"), a New York limited liability company. (Pet. ¶ 1, Ex. A.) Respondents seek to arbitrate various claims arising out of the Distribution agreement For Bieber Architectural Windows, dated March 12, 2013, between Respondent European Specialties, LLC and BEAW (the "Agreement") with Petitioners in their individual capacities. (Pet. Ex. B.)[1] Specifically, Respondents seek to arbitrate their claims that Petitioners and BEAW breached the Agreement by, among other things, "directing their efforts towards creating and engaging in a competing business during the term of the [A]greement," and using the benefits and good will of Respondents' trade name, email address, trademark, website, and product samples to obtain customers for that competing business. (Pet. Ex. A at 2.)

The initial preamble of the Agreement states that: "This Agreement is made on this date March 12, 2013 between 'European Specialties LLC' based in New York State and 'Bieber European Architectural Windows & Storefronts NY' based in New York State." (Agreement at 1.) The Agreement goes on to state that BEAW could be called "'You' or 'Your' or 'Bieber European Architectural Windows & Storefronts NY' or Sergey Boroditskiy or Anatoliy Koval or Aleksander Nester." (*Id.*) In the "Definitions" section, the Agreement states that the Agreement

---

[1] Pursuant to the Agreement, BEAW and European Specialties, LLC agreed that BEAW would serve as the exclusive product and brand representative for Bieber SA products throughout the East Coast of the United States. (Agreement ¶¶ 2, 11.) In addition, the Agreement enabled BEAW to buy Bieber SA products for resale to customers within the East Coast of the United States. (Affidavit of Benoit Luys, dated March 8, 2017, (Doc. 10) ("Luys Aff.") ¶ 3.) The Bieber SA product line generally consisted of "luxury class custom made to order windows and doors." (*Id*. ¶ 2.)

2

"is solely made with [BEAW] and its current members or officers," and "will not apply to new members or officers joining [BEAW]." (*Id.* ¶ 1.) In addition, the Agreement defines BEAW as a "Limited Liability Company represented by Anatoliy Koval, Sergey Boroditskiy, and Aleksander Nester." (*Id.*)

In the section titled "Dissolution and termination of the agreement" the Agreement enumerates the occurrences pursuant to which "[e]ither party may voluntarily withdraw from this agreement," and one such occurrence is the "change in management or ownership of [BEAW]." (*Id.* ¶ 5(3)(b).)

The arbitration provision set forth in the Agreement states, in its entirety: "Any controversy or claim arising out of or relating to this contract or to the breach thereof shall be settled [by] arbitration to be held in New York, NY, in accordance with the law in this jurisdiction, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof." (*Id.* ¶ 26.)

On the last page of the Agreement, above the signatures, the Agreement states: "This agreement is set forth for 3 years, from the date of the fully executed agreement, signed by both parties." (*Id.* at 17.) The lower half of the page provides space for the two parties to sign. "European Specialties LLC" is listed in the space provided for "THE IMPORTER," and Benoit Luys electronically signed for European Specialties LLC as its "duly authorized" member. (*Id.*) Luys is the managing member of European Specialties LLC. (Luys Aff. ¶ 1.) Below Luys's signature, BEAW is listed in the space provided for "THE FACTORY REPRESENTATIVE," and each Petitioner electronically signed for BEAW, each as "Its Member, duly authorized". (Agreement at 17.) The signatures appear as follows:

3

> IN WHITNESS WHEREOF, the parties have executed this Agreement on  Mar 12, 2013
>
> THE IMPORTER "European Specialties LLc":
>
> Signature: *Benoit LUYS (Mar 13, 2013)*
> Date: Mar 12, 2013
> By: Benoit LUYS
> Its Member, duly authorized
>
> THE FACTORY REPRESENTATIVE "Bieber European Architectural Windows & Storefronts NY":
>
> Signature: *Sergey Boroditskiy (Mar 12, 2013)*
> Date:
> By: Sergey Boroditskiy
> Its Member, duly authorized
>
> Signature: *Anatoliy Koval (Mar 13, 2013)*
> Date:
> By: Anatoliy Koval
> Its Member, duly authorized
>
> Signature: *Aleksander Nester (Mar 12, 2013)*
> Date:
> By: Aleksander Nester
> Its Member, duly authorized

(*Id.*)

Respondents believe Petitioners and BEAW breached the Agreement at least as early as spring of 2016 by establishing Open Architectural Windows and Doors ("OAWD") as a business that competes with Bieber SA and directing customers away from Bieber SA products and towards products of a competitor. (Luys Aff. ¶ 4.) Respondents note that publicly available sources, including Facebook and LinkedIn, indicate OAWD "claims to have been in business since 2009." (*Id.* ¶ 6.) In addition, Respondents note that OAWD appears to operate out of the same office and use the same telephone number that BEAW previously used. (*Id.*)

Respondents state that Petitioners Boroditskiy and Koval were in communication with a German competitor in 2015 and visited Germany in 2015, "apparently to speak to that and other competitors." (*Id.* ¶ 7.) Respondents assert Petitioners directed customers towards the products made by the German competitor and away from Bieber SA products. (*Id.*)

4

In addition, Respondents state that Petitioners "used the Bieber tradename, Bieber trademark, Bieber product samples, and Bieber shop drawings based on confidential proprietary business information from Bieber SA, in order [to] obtain contracts with customers, but the customers were later instead apparently supplied with and/or will now soon be supplied with products manufactured by Bieber SA competitors." (*Id.* ¶ 9.) Respondents claim email traffic and (lack of) order history demonstrate that, in more than one instance, Petitioners used the Agreement to obtain a customer but ultimately supplied that customer with the product of a competitor. (*Id.* ¶¶ 10–14.)

Petitioners state that during the term of the Agreement they were not involved in the marketing, selling, or installing of windows or doors except through BEAW. (Boroditskiy Aff. ¶ 2; Koval Aff. ¶ 2; Nester Aff. ¶ 2.)[2] Petitioners Boroditskiy and Koval acknowledge that they are members of OAWD (Petitioner Nester is not a member of OAWD); however, OAWD "did not exist in any form prior to its being registered with the New York Department of State in May 2016." (Boroditskiy Aff. ¶ 3; Koval Aff. ¶ 3.) In addition, Petitioners state that no business was done through OAWD before May 2016. (Boroditskiy Aff. ¶ 3; Koval Aff. ¶ 3.)

## II. Procedural History

On December 8, 2016, Petitioners received Respondents' Notice of Intention to Arbitrate. (Pet. ¶ 1.) Petitioners filed the Petition to Stay Arbitration on December 27, 2016, in the Supreme Court of the State of New York, County of New York. (*See* Pet.) Respondents removed the Petition to this Court on January 30, 2017. (Doc. 1.) On February 6, 2017, I issued a scheduling order directing Petitioners to serve any additional materials in support of the

---

[2] "Boroditskiy Aff." refers to the Affidavit of Sergey Boroditskiy, dated March 17, 2017, (Doc. 21-1); "Koval Aff." refers to the Affidavit of Anatoliy Koval, dated March 17, 2017, (Doc. 21-2); and "Nester Aff." refers to the Affidavit of Aleksander Nester, dated March 17, 2017, (Doc. 21-3).

5

Petition by February 17, 2017. (Doc. 4.) In accordance with the scheduling order, Petitioners submitted their memorandum of law in support of the Petition on February 17, 2017. (Doc. 7.) On March 9, 2017, Respondents submitted their memorandum of law in opposition to the Petition, along with their supporting affidavits and exhibits. (Docs. 10–17.) On March 17, 2017, Petitioners filed their reply memorandum of law in support of the Petition, along with their supporting affidavits. (Docs. 21, 21-1, 21-2, 21-3.)

On March 29, 2017, Respondents filed a letter motion requesting that the Petition be denied and also requesting an order compelling Petitioners to participate in the arbitration underlying the Petition. (Doc. 22.) On April 5, 2017, Petitioners filed a letter opposing Respondents' March 29 letter motion. (Doc. 23.)

### III. Legal Standard

In deciding motions to stay or compel arbitration, "courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)); *see also Lakah v. UBS AG*, 996 F. Supp. 2d 250, 255 (S.D.N.Y. 2014) (quoting *Bensadoun*, 316 F.3d 175) (deciding motion to stay arbitration). Courts must therefore "consider all relevant, admissible evidence submitted by the parties" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia*, 834 F.3d at 229 (citations omitted).

### IV. Discussion

#### A. *Judicial Determination of Arbitrability*

"The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "[B]efore an

agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017); *see also Schneider*, 688 F.3d at 71 (noting that there must exist "clear and unmistakable evidence that the parties agreed to arbitrate"). Thus, in cases where a party disputes whether "it is bound to an arbitration agreement, the issue of arbitrability is for the Court in the first instance." *Di Martino v. Dooley*, No. 8 Civ. 4606(DC), 2009 WL 27438, at *4 (S.D.N.Y. Jan. 6, 2009); *see also Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005) ("[A]rbitrability is not arbitrable in the absence of the parties' agreement.").

Here, neither party has identified "clear and unmistakable evidence" of an agreement to arbitrate arbitrability. *Schneider*, 688 F.3d at 71. In addition, Petitioners dispute that they are individually bound to the Agreement and thus similarly not bound to its arbitration provision. *See Di Martino*, 2009 WL 27438, at *4. Accordingly, the issue of whether this dispute is arbitrable and whether Petitioners are individually bound by the arbitration provision in the Agreement are issues I must determine.

      **B.**    *Arbitrability*

New York courts interpret arbitration agreements in the same way that they do other agreements—to give effect to the parties' intent and reasonable expectations based on the language used in the agreement. *See Breed v. Ins. Co. of N. Am.*, 413 N.Y.S.2d 352, 355 (1978). Although federal policy generally favors arbitration, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 192 (2d Cir. 2013) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "[A]ny silence or ambiguity about whether [an issue] is arbitrable reverses the usual

presumption that issues should be resolved in favor of arbitration." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 147 (2d Cir. 2001).

In addition, "a court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999). Accordingly, the Second Circuit, interpreting New York law, "has recognized only 'limited theories upon which it is willing to enforce an arbitration agreement against a nonsignatory.'" *Merrill Lynch Inv. Managers v. Opibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (quoting *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 780 (2d Cir. 1995)). "There are five such theories: '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'" *Id.* (quoting *Thomson–CSF*, 64 F.3d at 776). District courts should narrowly construe these five theories, each of which is governed by ordinary principles of contract and agency law. *See Thomson–CSF*, 64 F.3d at 776–80 (rejecting district court's adoption of hybrid approach and holding it was an "improper[ ] exten[sion of] the limited theories upon which [the Second Circuit] is willing to enforce an arbitration agreement against a nonsignatory").

Of the five theories that could potentially compel a nonsignatory to arbitrate, Respondents assert only that veil piercing and estoppel are relevant here.[3]

---

[3] In a single paragraph and without citing any factual support, Respondents assert that Petitioners agreed to be personally liable by signing the Agreement as members of BEAW, (Resp'ts Br. 10); however, this argument is wholly without merit. As Respondents acknowledge, the Agreement is between European Specialties LLC and BEAW, and Petitioners signed as "duly authorized" members of BEAW. (*Id.*; *see also* Agreement at 17). Moreover, numerous provisions of the Agreement use "either" or "both"—signifying not more than two—which suggests that the parties understood that only the corporate entities were parties to the Agreement. (*See, e.g.*, Agreement ¶ 5, at 17.) Contrary to offering "clear and explicit evidence" that Petitioners intended to be personally liable, *see Mason Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co., Inc.*, 301 F.3d 50, 53 (2d Cir. 2002) (per curiam), all available facts and evidence support the opposite conclusion—that Petitioners did not intend to be personally liable.

8

### 1. Veil piercing

Under New York law, a court may pierce the corporate veil where (i) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and (ii) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). "A non-signatory 'may be bound to arbitrate where it exercised complete control over a signatory and employed that domination to injure another signatory to the agreement.'" *McKenna Long & Aldridge LLP v. Ironshore Specialty Ins. Co.*, No. 14-cv-6633 (KBF), 2015 WL 144190, at *8 (S.D.N.Y. Jan. 12, 2015) (quoting *Masefield AG v. Colonial Oil Indus., Inc.*, No. 05 Civ. 2231(PKL), 2005 WL 911770, at *6 (S.D.N.Y. Apr. 18, 2005)); *see also Thompson-CSF*, 64 F.3d at 777–78. The conduct at issue must reveal a "virtual abandonment of separateness." *Thompson-CSF*, 64 F.3d at 777–78 (noting that courts will pierce the corporate veil "where a parent dominates and controls a subsidiary" (internal quotation marks omitted)). Determining that veil-piercing is appropriate is a "fact specific" inquiry, and courts consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

Respondents argue that Petitioners are bound to arbitrate as BEAW's alter ego because Petitioners dominated BEAW and misused Respondents' proprietary information, tradename, and trademark. (Resp'ts Br. 8–9.) In support of their alter ego argument, Respondents point to

the fact that during the pendency of the Agreement OAWD and BEAW shared a phone number, business address, and operated out of the same location. (*Id.*; *see also* Luys Aff. ¶ 6.) Respondents also assert that Petitioners solicited customers through BEAW using Respondents' trademark but later supplied those customers through OAWD with products of Respondents' competitor. (Resp'ts Br. 9; Luys Aff. ¶¶ 7–8.) In response, Petitioners point to the undisputed fact that OAWD did not even come into existence until May 31, 2016, after the Agreement expired. (*See* Luys Aff. Ex. D.) Petitioners also state that during the term of the Agreement they were not involved in the marketing, selling, or installing of windows or doors except through BEAW. (Boroditskiy Aff. ¶ 2; Koval Aff. ¶ 2; Nester Aff. ¶ 2.)

Accepting Respondents' version of the facts as true, I find that Respondents' alter ego argument falls well short of what is required to sustain such a claim; therefore, there is no basis to determine that Petitioners acted as the alter ego of BEAW. *See Thompson-CSF*, 64 F.3d at 778 (holding veil piercing not appropriate "in light of the totality of the circumstances" despite finding of common ownership and control). Petitioners incorporated OAWD in 2016 after the Agreement terminated, (Luys Aff. Ex. D), and thereafter supplied customers with products from Respondents' competitors. The fact that two members of BEAW are now members of OAWD, and that OAWD now operates out of the same office space that BEAW occupied, without more, does not support a finding that Petitioners were the alter egos of BEAW during the pendency of the Agreement. In addition, Petitioners' trip to Germany, "apparently to speak to . . . competitors," (Luys Aff. ¶ 7), is speculation that cannot form the basis of an alter ego finding. Moreover, Respondents do not allege, much less submit evidence, regarding inadequate capitalization, intermingling of funds, or self-dealing. *See Freeman*, 119 F.3d at 1053. Contrary to demonstrating a "virtual abandonment of separateness," *Thompson-CSF*, 64 F.3d at 777–78,

the evidence in the record supports the conclusion that Petitioners observed corporate separateness during the pendency of the Agreement, ceased operating BEAW once the Agreement expired in spring 2016, and began operating OAWD as of May 2016.

## 2. Estoppel

Under the estoppel theory, a party is estopped from avoiding arbitration when it has received a direct benefit from an agreement containing an arbitration clause. *See MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (noting that nonsignatory who knowingly benefits from "an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement" (quoting *Thomson-CSF*, 64 F.3d at 778)). "The benefits must be direct—which is to say, flowing directly from the agreement." *Id.*; *see also McKenna Long & Aldridge LLP*, 2015 WL 144190, at *9 (collecting cases and drawing distinction between direct and indirect benefits). A benefit is indirect "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *MAG Portfolio Consultant*, 268 F.3d at 61; *see also Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011) (noting that "benefits are direct when specifically contemplated by the relevant parties; and benefits are indirect when the parties to the agreement with the arbitration clause would not have originally contemplated the non-signatory's eventual benefit"). In addition, nonsignatories cannot be compelled to arbitrate under the direct-benefit estoppel theory solely due to their affiliation with a signatory. *See MAG Portfolio Consultant*, 268 F.3d at 62 ("[A] signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party."); *Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09 Civ. 8154(LAP), 2010 WL 743915 at *2 (S.D.N.Y. Mar. 2, 2010) ("The mere fact of a

nonsignatory's affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is.").

Respondents argue that Petitioners took advantage of the Agreement and gained a direct benefit by misusing Respondents' proprietary information, trademark, and trade name to develop a competing business and attract customers for that other business. (Resp'ts Br. 6–8.) Specifically, Respondents argue that the direct benefits Petitioners received consist of the customers Petitioners obtained by using Bieber SA's products even though those customers "were later instead apparently supplied with . . . products manufactured by Bieber SA competitors." (Luys Aff. ¶ 9.) Petitioners deny that they took advantage of Respondents' proprietary information, trademark, or trade name allegations, and argue that, even if those allegations were true, the benefits Respondents describe are indirect. (Pet'rs Reply 4–6.)

Even accepting Respondents' version of the facts regarding Petitioners' conduct as true, I find that any such benefits Petitioners derived were indirect. The benefits Respondents describe—attracting customers using Bieber SA products then selling those customers other products—are not contemplated by the Agreement and thus are indirect. *See Life Techs. Corp.*, 803 F. Supp. 2d at 276 (noting that "benefits are indirect when the parties to the agreement . . . would not have originally contemplated the non-signatory's eventual benefit"); *Katsoris v. WME IMG, LLC*, 237 F Supp. 3d 92, 108 (S.D.N.Y. 2017) (declining to compel arbitration and holding nonsignatory did not receive direct benefit of the contract where contract was for production of television series concept and nonsignatory obtained a benefit related to distribution of that television series). Indeed, the alleged benefits identified by Respondents run contrary to the intention of the Agreement.[4] In addition, under Respondents' scenario, any benefits Petitioners

---

[4] Respondents conflate two separate issues. Whether Respondents have a cause of action against Petitioners for their alleged conduct is a separate question (which is not before me) from whether Petitioners received a direct

derived from the Agreement were only realized after the customer was directed away from the Bieber SA product and towards the competitor's product, and after the customer ultimately sold that product. Accordingly, any benefits Petitioners obtained from the Agreement were indirect, and thus Petitioners are not estopped from avoiding arbitration.

## V. Conclusion

For the foregoing reasons, I find that Petitioners each signed the Agreement in their capacity as a member of BEAW and Respondents have failed to demonstrate that Petitioners (i) acted as the alter ego of BEAW or (ii) should be estopped from avoiding arbitration. Accordingly, the Petition, (Doc. 1, Ex. 2), is GRANTED and the arbitration is permanently stayed as to Petitioners.

The Clerk's Office is respectfully directed to terminate the motion at Document 22 and close the case.

SO ORDERED.

Dated: June 4, 2018
      New York, New York

*Vernon S. Broderick*
Vernon S. Broderick
United States District Judge

---

benefit from the Agreement such that they are estopped from avoiding arbitration.

13